MEMORANDUM OF DECISION
This memorandum of decision addresses coterminous petitions for adjudication of neglect and termination of the parental fights (TPR) along with a pending motion for transfer of guardianship, all involving Tracy M. and William R., Sr. (William Sr.) and their child William, who was born on July 2000. The Department of Children and Families (DCF) filed the coterminous petitions against the respondent parents on September 12, 2000. The neglect petition alleges that William was neglected and uncared for while he was in the custody of Tracy M. and William Sr.[2] The TPR petitions allege against each respondent the sole ground that William is under seven years of age, and they are the parents of another child to whom their parental fights were previously terminated. On April 6, 2001 Tracy M. filed the pending motion to transfer William's guardianship to his maternal aunt, Jennifer M. For the reasons stated below, the court finds each of these matters in favor of the petitioner.;
The file reflects that on September 19, 2000, following DCF's issuance of a ninety-six hour hold, the court entered an Order of Temporary Custody (OTC) placing William in DCF's custody. (Goldstein, J.) This temporary commitment has continued without hiatus. Thereafter, William Sr. failed to attend a related proceeding scheduled for October 12, 2000, and the court entered a default against him. (Goldstein, J.) As both respondents have been duly served and advised,[3] the court permitted William Sr. to participate in these proceedings, with the assistance of counsel and without prejudice. Accordingly, the court finds the earlier default to be moot.
Trial of these highly contested issues took place on May 2, 3, and 4, 2001. Tracy M. and William Sr. were present at each court session; the respondents, the petitioner and the minor child were vigorously represented by their respective counsel[4] throughout the trial and at a post-trial proceeding.[5] Counsel for Tracy M. submitted a post-trial brief on May 10, 2001. Without objection, following the close of evidence, Exhibit A. was submitted on Tracy M.'s behalf and received by the court on June 4, 2001.
The Child Protection Session, Superior Court for Juvenile Matters, has jurisdiction over the pending matter. No action is pending in any other court affecting custody of the child at issue.
 I. FACTUAL FINDINGS
CT Page 12198-a
The court has thoroughly reviewed the verified petitions, the TPR social study[6] and addendum, and the multiple other documents submitted in evidence, which included reports reflecting services from health care and substance abuse treatment facilities, as well as court records. Witnesses included service providers, DCF personnel, a police officer, a family member, and William Sr.[7] Having considered the verified petitions and all of the evidence according to the standards required by law,[8] the court finds that the following facts were proven by clear and convincing evidence at trial:
I. A. TRACY M., THE MOTHER
Tracy M. was born June 28, 1971, and is a high school graduate. Although she has occasionally worked as a waitress, cashier or a nanny, she has had extended periods of unemployment, homelessness, or impermanent housing. (Exhibits 1, 6.) Domestic violence permeated her long term but unstable relationship with William Sr., who is the father of both her biological children. (Exhibit 21, Testimony of Kerry W.)
Tracy M. has a lengthy, documented history of marijuana and cocaine abuse. Her drug use commenced in her teen years and has continued virtually unabated. Prior to the birth of her first child, Anthony, on July 25, 1998, Tracy M. made repeated unsuccessful attempts to achieve functional sobriety by attending in-patient and out-patient substance abuse programs including Merritt Hall and SCADD.[9] As described below, Tracy M.'s multiple in-patient treatment efforts following Anthony's birth have been similarly unsuccessful. (Exhibits 6, 21.)
Tracy M. had first come to DCF's attention in late July 1998, when the hospital where she had just given birth to Anthony reported that both mother and child tested positive for cocaine. (Exhibit 21.[10]) At trial of the pending matters, the parties stipulated that on March 9, 2000, the court (Conway, J.) terminated both Tracy M.'s and William Sr.'s parental rights to Anthony R.
Tracy M. continued to use both marijuana and significant amounts of cocaine, even after she became pregnant again. (Exhibit 21.) On June 29, 2000, during the last stages of her pregnancy with William, Tracy M. voluntarily entered Amethyst House, a residential substance abuse treatment facility. Two days later, on July 1, 2000, Tracy M. gave birth to William at a local hospital. At the hospital's direction, Tracy M. returned to residence at Amethyst House with the baby shortly after mother and child were discharged. However, Tracy M. left that residential program on July 3, 2000, as "she wanted to be at home with her child and not in a treatment program." (Exhibit 6; see also Exhibits 1, 3, 21.) Thereafter, Tracy M. and her infant joined William Sr. in residence in a CT Page 12199 motel which was located in an area noted for its high level of drug-related activity. Amethyst House notified DCF of Tracy M.'s unsuccessful discharge from their program, and prompted DCF's involvement in the case involving the newborn William. (Exhibits 6, 21; Testimony of Kerry W.)
In an effort to address the respondents' substance abuse and housing issues, Tracy M. and William Sr. entered into a service agreement with DCF on July 3, 2000. The agreement represented that neither parent would use illegal drugs; that both would complete substance abuse evaluations and follow treatment recommendations; and that both would keep DCF apprised of their whereabouts. (Exhibit 1.)
In accordance with the service agreement, DCF transported Tracy M. to the Valley Shore Counseling Center/The Connection, Inc. (Valley Counseling), where she underwent a substance abuse evaluation on July 31, 2000. Valley Counseling diagnosed Tracy M. with cocaine abuse and, accordingly, advised her to attend that agency's weekly relapse prevention group, and to continue at a 12-Step self help group. Valley Counseling also provided Tracy M. with information regarding additional in-patient substance abuse treatment programs. (Exhibits 6, 21.) Ominously, Tracy candidly advised the Valley Counseling staff "that if the crack cocaine is in front of her she will use." (Exhibit 6.)
Tracy M.'s domestic violence issues became apparent on August 5, 2000, when she sought temporary protection from William Sr., who had severely assaulted her in the course of a recent altercation which took place in the infant's presence. (Exhibit 21; Testimony of Kerry W.) As a result, Tracy M. and baby William spent three days in residence at the New Horizons domestic violence shelter. On August 8, 2000, DCF again transported Tracy M. to Valley Counseling for additional substance abuse testing. Urine and hair analysis demonstrated that Tracy M. had used cocaine on divers, recent occasions, throughout the latter part of her pregnancy, at the time of William Sr.'s domestic assault upon Tracy M., and while the respondents were serving as the sole caretakers for William (Exhibits 6, 9, 10, 11, 21.) Both DCF and Valley Counseling encouraged Tracy M. to follow through with substance abuse treatment recommendations. However, Tracy M. did not promptly respond to this proffer of services, but continued to smoke crack cocaine with William Sr. in their motel room, and in the presence of their infant. (Exhibit 21.)
At the time of William's birth, Tracy M. was serving a sentence of probation. On September 7, 2000, she was taken into custody by law enforcement officials and charged with violating the conditions of her probation. Incarcerated in lieu of posting bond, Tracy M. ceded care of CT Page 12200 William to her younger sister, Jennifer M. (Exhibits 2, 21.) On September 8, 2000, DCF imposed a ninety-six hour hold on the child, who needed medical attention. (Exhibit 21.)
On September 12, 2000, the court (Frazzini, J.) issued specific steps for Tracy M. Her DCF caseworker reviewed these steps with Tracy M. on multiple occasions, encouraging the respondent to comply with all aspects of her stated obligations to: refrain from substance abuse and involvement with the criminal justice system; undergo substance abuse assessments and random drug testing; participate in counseling and treatment,[11] and follow recommendations regarding treatment, aftercare and relapse prevention. (Exhibits 12, 21; Testimony of Kerry W.)
In November 2000, while incarcerated in lieu of bond, Tracy M. earned a certificate for attendance at a six hour rehabilitation program sponsored by the Department of Corrections (DOC). (Exhibit A.) Thereafter, the criminal court afforded Tracy M. the opportunity to participate in substance abuse treatment programs as a condition of bond, in lieu of detention.
From November 30, 2000 through January 26, 2001, upon a mandated referral from the criminal court which coordinated with the specific steps, Tracy M. resided at the substance-abuse treatment program sponsored by the Elm City Women and Children's Program (EC-WAC).[12]
This program offered a one-year extended course of substance abuse treatment, parenting and individual counseling for Tracy M. Like Valley Counseling, EC-WAC also diagnosed Tracy M. as suffering from cocaine abuse. Lamentably, despite the fact that she had been placed in this program by the criminal court, and despite specific, repeated warnings, Tracy M. persistently failed to comply with reasonable EC-WAC program rules. These violations resulted in Tracy M.'s discharge from EC-WAC after less than sixty days of treatment. At the time of this program termination, it was clear that Tracy M. still "required continued intensive residential program status" to deal with her substance abuse problems. (Exhibit 4; see also Testimony of Susan A., Kerry W.)
Tracy M. was immediately offered another opportunity for multi-modal in-patient substance abuse treatment and personal therapy through the Morris Foundation's Women and Children's Program (MF-WAC). She attended this program from January 26 until March 1, 2001.[13] Although she initially demonstrated compliance with program conditions, Tracy M. subsequently violated the reasonable rules established by the MF-WAC program, and was terminated for non-compliance, as she had been from the EC-WAC program. Upon discharge, MF-WAC recommended that Tracy M. participate in out-patient treatment at the Morris Foundation's CT Page 12201 Therapeutic Shelter (MF-TS), obtain counseling at Safe Haven, and continue to comply with her regimen of prescribed antidepressant medication. (Exhibit 3; Testimony of Kerry W.) However, despite a brief stay at the MF-TS program, Tracy M. was returned to DOC custody on March 29, 2001. The respondent mother has thereafter remained incarcerated. (Testimony of Kerry W.)
Tracy M.'s long history of involvement with the criminal justice system had commenced in 1994, when she was in her early twenties. Since then, she has been convicted for Violating Protective Orders (§ 53a-110b); Interfering with a Police Officer (§ 53a-167a); Larceny (§53a-125a, 125); Violations of Probation Orders (§ 53a-32); Forgeries (§ 53a-140); Failures to Appear (§ 53a-173); Criminal Impersonation (§ 53a-130); and Burglaries (§ 53a-103). (Exhibit 2.) In addition, on May 27, 2000, while she was pregnant with William, Tracy M. was arrested for committing an Assault on an Officer (§53a-167c). On September 15, 2000, while her specific steps were in effect and the TPR and neglect petitions were pending before the Superior Court for Juvenile Matters, Tracy M. was arrested for driving under the influence (§ 14-227a). She was held in lieu of bond after arraignment. (Exhibits 2, 23; Testimony of Kerry W.)
On April 27, 2001, Tracy M. was convicted of Burglary, Violation of Probation, and Assault on Personnel. She received a total effective sentence of forty-two months of incarceration, suspended after fifteen months, with three years of probation, disposing of all her pending criminal charges. As noted, Tracy M. remained incarcerated at the time of this hearing. (Exhibits 2, 23.)
I. B. WILLIAM SR., THE FATHER
William Sr. was born December 31, 1964. He is a high school graduate and has attended some college courses. (Exhibit 1.) As noted, the parties stipulated that on March 9, 2000, the court (Conway, J.) had previously terminated William Sr.'s parental rights to Anthony R., who was born July 25, 1998. (See Exhibit 21.) In addition to Anthony R. and William, William Sr. has three older children whom he is lawfully obliged to support. However, as a result of his non-payment of child support, he has accrued a $40,000 arrearage. (Testimony of William Sr.)
William Sr. admits that he has persistent problems controlling his anger. (Testimony of William Sr.) He has threatened and assaulted his domestic partner in the presence of their newborn child, causing Tracy M. to sustain bruises all over her body. (Exhibit 21; Kerry W.)
This respondent does not maintain lawful employment or stable housing. CT Page 12202 During the late summer of 2000, he was evicted from the local motel where he had taken up semi-permanent residence, and thereafter his whereabouts were unclear except during periods of his incarceration.[14] Although William Sr. made himself unavailable for contact by DCF after the agency assumed custody of William in September 2000, William Sr. has called no more than twice to inquire about the status of his son. (Exhibit 21; Testimony of Kerry W.)
Although he continues to deny a substance abuse problem, the evidence clearly and convincingly establishes that William Sr. has a long history of abusing cocaine and marijuana: both Tracy M. and Jennifer M. identify him as a "drug addict and dealer," which is consonant with the history of arrests for possession and sale of narcotics set forth in Exhibit 13. (See also Exhibits 1, 21, 22.) As noted in Part I. A., on July 3, 2000, William Sr. entered into a service agreement requiring him to refrain from using illegal drugs; to complete substance abuse evaluations and follow treatment recommendations; and to keep DCF appraised of his whereabouts. (Exhibit 1.) Nonetheless, as noted, William Sr. smoked crack cocaine in the infant's presence in the motel room he briefly occupied with Tracy M. (Exhibit 21.) Whether William Sr. actually refused the timely and reasonable offers of assessment and drug treatment proffered by DCF or merely failed to follow up on the agency's referrals, his failure to comply with this request is consistent with his unrealistic insistence that he has no substance abuse issues which need attention. (Exhibit 21; Testimony of William Sr., Kerry W.) Furthermore, William Sr.'s failure to maintain contact with DCF effectively eliminated the agency's ability to extend further rehabilitative services to him. (Testimony of Gillian V.) William Sr. admits that since DCF obtained custody of William in October of 2000, he has neither pursued nor obtained treatment for his substance abuse issues. (Exhibit 21; Testimony of William Sr., Kerry W.)
As mentioned, William Sr. has a long history of involvement with the criminal justice system. In the past twelve years, he has acquired numerous convictions for offenses related to Narcotics Sales (§ 21a-277
(a) and Possession (§ 21a-279 (a)); Violations of Probation Orders (§ 53a-32); and Interfering with a Police Officer (§ 53a-167a). In addition, on November 5, 2000 and January 17, 2001, in the face of the service agreement and while the neglect and TPR petitions were pending, William Sr. was again arrested for Possession of Narcotics. William Sr. remained held in lieu of bond from January 7, 2001 until April 10, 2001, when he was sentenced to a total effective sentence of one year in jail for two counts of Possession of Narcotics and one count of Interfering with a Police Officer. (Exhibits 13, 21, 22.) At the time of trial, William Sr. was incarcerated, although he professed to be eligible for release during the fall of 2001. (Testimony of William Sr.) It is notable CT Page 12203 that while he has been incarcerated, William Sr. has adamantly refused to have William come to visit him.[15] Accordingly, DCF's efforts to provide visitation went unmet.
I. C. WILLIAM, THE CHILD
William was born on July 2000. He is now a year old, a healthy baby who has bonded well with his foster parents. (Testimony of Kerry W.) When in the custody of Tracy M. or William Sr., the infant resided in a local motel, at a domestic violence shelter, or, very briefly, in the care of Jennifer M. William has been in DCF custody since September 8, 2000. Thus, he has spent the great majority of his life in foster care, while the respondents addressed their obligations to the criminal justice system, and while Tracy M. attempted, yet again, to deal with her substance abuse issues.
 II. NEGLECT ADJUDICATION
As provided by Practice Book § 33-12 when addressing coterminous petitions, "the judicial authority first determines whether the child is neglected, uncared for or dependent by a fair preponderance of the evidence; if so, then the judicial authority determines whether statutory grounds exist to terminate parental rights by clear and convincing evidence; if so, then the judicial authority determines whether termination is in the best interest of the child by clear and convincing evidence. If the judicial authority determines that termination grounds do not exist or termination is not in the best interest of the child, then the judicial authority may consider any of the dispositional alternatives available under the neglect, uncared for or dependent petition by a fair preponderance of the evidence."
In accordance with the applicable legal requirements,[16] based on the factual findings set forth in Part I., the court finds by a fair preponderance of the evidence that the child William was neglected and uncared for within the meaning of General Statutes § 46b-120 (9)(B) and (C).[17] The evidence clearly establishes the respondents' drug use in the child's presence during the first weeks of William's life, and further indicates that each respondent caused, allowed or permitted William to witness domestic violence that resulted in injuries to his mother. Thereby, this newborn child was denied proper care and attention, physically, emotionally or morally, and he was therefore neglected as contemplated by § 46b-120 (9)(B). The evidence also clearly reflects that the respondents maintained no permanent home for William during his newborn days, but caused, allowed or permitted him to reside in the immediate vicinity of narcotics, narcotics users, and in an environment in which the child was exposed to cocaine. As a result, CT Page 12204 William was uncared for within the meaning of § 46b-120 (9)(B). Thus, the petitioner has met her burden of proving these issues by a preponderance of the evidence, and the court accordingly adjudicates William a neglected and uncared for child.
 III. TERMINATION OF PARENTAL RIGHTS ADJUDICATION
Having adjudicated William a neglected and uncared for child, the court is next called upon to determine whether the petitioner has met her burden of proving the allegations presented by the TPR petitions pending against Tracy M. and William Sr.[18] Practice Book § 33-12. As the petitions rest upon the sole ground of failure to rehabilitate when parental rights were terminated for another child, the court has considered the evidence and testimony related to circumstances and events following the date the TPR petitions were filed, 2 through the close of evidence, for purposes of assessing the degree of rehabilitation, if any, the respondents have achieved.[19]
 III. A. LOCATION AND REUNIFICATION
The court finds that the petitioner has met her burden of proving, by clear and convincing evidence, that reasonable efforts[20] were made to locate and reunify each respondent parent with their child William, as required by General Statutes § 17a-112 (c)(1).[21]
As to the reasonable reunification efforts extended to Tracy M., the clear and convincing evidence reflects that she only partially participated in the substance abuse and counseling services promoted for her rehabilitation, as discussed in Parts I. A., III. B. 1., and IV. A. 1. However, Tracy M. was incarcerated or enrolled in in-patient substance abuse programs during most of the child's life, limiting her opportunities for visitation. Tracy M. has offered her sister, Jennifer M., as a family placement resource for William, ostensibly to promote reunification. However, as discussed in Parts IV. and V., the court has determined that placement with Jennifer M. would not serve William's best interests. Furthermore Tracy M. did not identify her mother as a potential placement resource until the immediate pretrial period, William's maternal grandmother has not come forward to formally express her interest in caring for William. In the absence of evidence to the contrary, the court concludes that placement with the maternal grandmother would not serve William's best interests. (Testimony of Kerry W., Gillian V.)
Clear and convincing evidence also reflects that although DCF offered visitation and substance abuse treatment services to William Sr., this respondent plainly rejected these reasonable reunification efforts. CT Page 12205 William Sr. has been incarcerated during much of William's life. By choosing not to visit with William and by refusing to participate in DCF's proffered substance abuse evaluation process, William Sr. severely limited any reasonable opportunities for reunification with his child. (Testimony of William Sr., Kerry W.) "Without participation [by the respondent] in the services offered . . . further services would have been of no benefit toward any reunification." In re Antonio M.,56 Conn. App. 534, 547, 744 A.2d 915 (2000).
William Sr. has proffered his teenaged daughter and Judy C., another family member, as family placement resources for William. However, in view of the daughter's failure to maintain a stable residence, and family concerns about Judy C.'s ability to care for the child, DCF has reasonably concluded that William's best interests would not be served through either placement. (Testimony of Kerry W., Gillian V.)
The clear and convincing evidence in this matter supports the conclusion that, under the circumstances, both Tracy M. and William Sr. are unable or unwilling to benefit from further reunification efforts. § 17a-112 (c)(1).
III. B. STATUTORY GROUNDS FOR TERMINATION
The petitioner claims that the statutory grounds for termination established by General Statutes § 17a-112 (c)(3)(E)[22] are satisfied in this case as to both Tracy M. and William Sr., supporting termination of their parental rights to William. The evidence establishes, without question, that William is a child under the age of seven, and that the respondents' parental rights to their biological son, Anthony, were previously terminated by court order in response to a petition filed by DCF. Accordingly, the remaining issue for this court to resolve is whether either parent has achieved rehabilitation, within the general meaning attributed to General Statutes § 17a-112.[23]
 III. B. 1. TRACY M., THE MOTHER — FAILURE TO REHABILITATE WITHPREVIOUS TERMINATION OF PARENTAL RIGHTS — § 17a-112 (c)(3)(E)
As the petitioner has alleged the single statutory ground of §17a-112 (c)(3)(E) against Tracy M., the critical issues in this matter center upon her long and unsuccessful struggle with substance abuse, homelessness, victimization in domestic violence matters, anger issues and criminal behavior. Applying the requisite legal standards,[24] and upon consideration of all the evidence presented in this matter, the court finds this issue in favor of the respondent. CT Page 12206
The clear and convincing evidence in this case establishes that Tracy M. has failed to succeed with anything except the most elementary stages of substance abuse rehabilitation: this leads to the clear inference that drug use and affiliation with William Sr., not child care, remains her highest priority, as they have for a prolonged period of time. Tracy M. did not satisfactorily complete substance abuse treatment from SCADD or Merritt Hall, prior to the birth of Anthony, and consequently her first child was exposed to cocaine in utero. Thereafter, notwithstanding the termination of her parental rights to Anthony, Tracy M. consistently failed to cooperate with the rehabilitation opportunities provided to her, either by DCF or the DOC. (Exhibits 3, 4, 6.) After continuing to use cocaine and marijuana throughout her pregnancy with William, it is true that Tracy M. voluntarily entered the residential program of substance abuse treatment proffered by Amethyst House. However, her enrollment in this facility provided succor neither for the respondent mother or her child, as Tracy M. stayed at that facility for only a brief time, then left to give birth to William. As indicated in Part I. A., although the safety and security of Amethyst House was made available to her after William's birth, Tracy M. rejected this option for rehabilitation, and elected to return to her unstable and unpredictable life with William Sr.
Despite the implications of the service agreement she had entered into with DCF on July 3, 2000, Tracy M. continued using cocaine after William's birth. Thus, the first days of her child's life were marked by exposure to parental substance abuse, as the infant was present when Tracy M. and William Sr. used crack cocaine. William was also exposed to domestic violence when William Sr. threatened to cause serious harm to Tracy M. and severely assaulted her in the child's presence at their temporary motel residence. The next few days of young William's life were spent in a domestic violence shelter, to which Tracy M. fled after the assault. After she left that facility, there is no evidence to indicate that Tracy M. made any effort to secure an appropriate home for herself and her child, or take advantage of the weekly relapse prevention group 12-Step meetings to which she had been referred by Valley Counseling. Rather, the clear and convincing evidence establishes that instead of creating a safe, stable living environment for herself and her infant, Tracy M. was again arrested and incarcerated in early September 2000, in response to charges of violating probation. (Exhibits 2, 23).
As noted in Part I. A., after attending a brief DOC drug treatment program, Tracy M. received two additional opportunities for long-term in-patient care and attention to her substance abuse needs through referrals made to EC-WAC and MF-WAC during the ensuing incarceration. Each of these residential programs would have permitted Tracy M. to be reunited with William, and to serve as his primary caregiver during the CT Page 12207 rehabilitation process. Unfortunately, Tracy M. persisted in violating program rules at each facility, and therefore, as the result of her own failure to cooperate, was denied the opportunity for stable housing, substance abuse treatment in a setting where she would be allowed to care for her child, and counseling for her anger and domestic violence issues. At EC-WAC, despite due warnings, Tracy M. overtly violated the protocol which prevented fraternization among program participants, and earned her discharge after only a month of treatment. Instead of being returned directly to the DOC, she was transferred to the MF-WAC program, where she was given yet another chance to achieve the noteworthy goals of both substance abuse rehabilitation, and avoidance of long-term incarceration. Again, however, Tracy M. demonstrated her self-destructive pattern of failing to observe reasonable program rules, yielding instead to her need for immediate gratification by deceitfully communicating with William Sr., who was acknowledged as a substance abuser and trigger for Tracy M.'s drug use. (Exhibit 3.) Again, Tracy M.'s non-compliance with reasonable program conditions earned her an unfavorable discharge from an in-patient substance abuse facility. Because she had twice failed to achieve any meaningful degree of rehabilitation from her substance, abuse, Tracy M. was not able to utilize the MF-TS or Safe Haven programs, but was re-incarcerated in early March 2001.
The evidence clearly and convincingly reflects that Tracy M. has not complied with the specific steps which were imposed for the purposes of understanding and controlling the impulses that impel her toward drug use, foster her anger, and keep her ensnared in her relationship with William Sr., a partner who subjects her to domestic violence and a chaotic lifestyle. Tracy M. did not obtain parenting and individual counseling directed at helping Tracy M. comprehend the devastating impact that chronic maternal drug use and exposure to domestic violence would have upon her child. (Exhibit 12; Testimony of Kerry W.) During the past year, Tracy M. has made woefully little progress in addressing her significant parenting, anger and substance abuse issues. As noted, she never followed through with Valley Counseling's recommendations for treatment. When Tracy M. failed to achieve rehabilitation at EC-WAC in January 2001, it was clear that this respondent's substance abuse problems could only be dealt with at an intensive residential program. (Exhibit 4; Testimony of Susan A.) Fortunately, Tracy M. was next referred to MF-WAC's in-patient program, which offered the specific services she required: again, however, Tracy M. failed to achieve rehabilitation despite in-patient services. When she was terminated from MF-WAC for non-compliance, the program confirmed that Tracy M. still needed additional substance abuse treatment, and recommended participation with various providers. (Exhibit 3.) Accordingly, Tracy M. has failed to achieve sufficient personal rehabilitation because of her own lack of compliance with treatment providers, and because she failed CT Page 12208 to adequately avail herself of the assistance tendered through the service providers identified above. See In re Amber B., 56 Conn. App. supra, 782.
Tracy M. may argue that she was unable to comply with the MF-WAC recommendations because of her incarcerated status. In this case, however, the evidence leaves no reasonable basis for concluding that, even if Tracy M. was given yet another opportunity for rehabilitative treatment, she would be willing or able to comply with the program's rules, successfully complete the therapeutic regimen, or maintain sobriety after discharge.[25] Given Tracy M.'s history of drug use, domestic violence, and incarcerations "[t]here was little or no evidence to suggest that the respondent had ever played a constructive and useful role as a parent." In re Sarah Ann. K., 57 Conn. App. 441,449, ___ A.2d ___ (2000).
The application of § 17a-112 also requires the court to analyze whether Tracy M. has achieved a degree of rehabilitation which allows it to reasonably foresee that, within a reasonable time in the future, she will be able to serve as a responsible, effective caretaker for William.In re Ashley S., supra, 61 Conn. App. 665; In re Sarah Ann K., supra,57 Conn. App. 448-9. The clear and convincing evidence related to Tracy M.'s failure to cooperate with any substance abuse programs, even in the context of an opportunity to avoid return to incarceration, supports the conclusion that she will not achieve this status in the reasonably foreseeable future. Moreover, in view of Tracy M.'s history of failed program efforts, chronic addiction to cocaine, and chronic involvement with both William Sr. and criminal activity, the evidence in this matter clearly and convincingly supports the inference that Tracy M. is likely to resort to her past behaviors whenever she is given any opportunity to do so, thus portending failure in any substance abuse program in which she is enrolled, without achieving any meaningful degree of rehabilitation.
At the time of trial, Tracy M. anticipated an early release from her incarceration. Even if this should take place, she remains without the skills or experience necessary to establish a drug-free lifestyle. She has not overcome her long-standing substance abuse issues. Domestic violence, criminal acts, and homelessness remain disturbing issues in her life. She does not possess the ability to ensure her own safety, let alone that of a child for whom she may be responsible. Tracy M. has failed to comply with the specific steps which directed her to refrain from substance abuse, to participate in the drug abuse rehabilitation process and to follow recommendations regarding treatment, aftercare and relapse prevention. She has not completed parenting or individual counseling which is intrinsic to her ability to provide a safe and secure CT Page 12209 home for any child. (Testimony of Kerry W.) There is no reliable evidence from which the court could reasonably infer that she is likely to adopt a stable lifestyle in the reasonably near future, or that she has the ability or willingness to overcome her homelessness, anger issues, or predilection for substance abuse.
William, who is just over one year old, has now been adjudicated neglected. The court previously terminated Tracy M.'s rights to Anthony R. Under these circumstances, the court now finds, by clear and convincing evidence, that either as of the date of the TPR filing in this case, or as of the completion of this trial, Tracy M. had not achieved such a degree of personal rehabilitation as would encourage the belief that, within a reasonable foreseeable time, considering William's very young age and absolute dependency upon others, this respondent could assume a responsible position in his life. In re Sarah Ann K., supra,57 Conn. App. 448. Accordingly, the court finds, by clear and convincing evidence, that the petitioner has proved Tracy M.'s failure to achieve rehabilitation pursuant to § 17a-112 (c)(3)(E).
 III. B. 2. WILLIAM SR., THE FATHER — FAILURE TO REHABILITATE WITH PREVIOUS TERMINATION OF PARENTAL RIGHTS — § 17a-112 (c)(3)(E)
The petitioner also alleges that the sole statutory ground of parental failure to rehabilitate supports the application for termination of William Sr.'s parental rights to William, pursuant to § 17a-112
(c)(3)(E). In evaluating this claim, the court adopts and applies the findings regarding the age of the child at issue, the prior termination of parental rights, and the legal standards set forth in Part III. B. 1. As to William Sr., the critical issues center upon his substance abuse, domestic violence, homelessness and repeated criminal behavior. Applying the requisite principles of law, and upon consideration of all the evidence presented in this matter, the court finds this issue in favor of the petitioner.
William Sr. candidly admits that DCF offered him substance abuse evaluations and treatment, and that he did not comply with this request. (Testimony of William Sr.) William Sr. steadfastly denies that he has a substance abuse problem, indicating his inability or unwillingness to recognize the many aspects of the evidence which leads to the contrary conclusion, including the significance of his long history of drug-related convictions; the fact that he is currently serving a sentence for possession of narcotics; his past choice to reside with Tracy M. and his newborn child in an area known for high levels of drug activity; his protracted periods of homelessness; and the claims of Tracy M. and Jennifer M. that he uses and deals drugs. (See Part I. B.) CT Page 12210
William Sr. does admit that he has an anger problem, and that he has assaulted Tracy M. in the past. However, he attributes any domestic violence to Tracy M.'s use of drugs, and does not accept responsibility for his participation in the assaults. (Testimony of William Sr.) He has attended no classes dealing with anger or violent behavior, and has neither addressed nor developed plans for attention to the substance abuse and domestic violence issues which affect him and those who may keep his company. (Testimony of William Sr., Kerry W.) Under these circumstances, the court is constrained to conclude that William Sr. has achieved no degree of ability to control these behaviors, and thus has not gained the ability to care for the needs of his very young son, who has absolutely no ability to provide for himself.
Whether as a result of his substance abuse issues or due to a faulty reasoning process, the evidence also establishes that William Sr. has intentionally kept himself unavailable to DCF. He has consistently provided the agency with addresses at which he does not reside, and telephone numbers at which he cannot be reached. DCF cannot be faulted "for not being able to deliver services to the respondent when he failed to inform the department of his whereabouts. . . ." In re Natalia G., supra, 54 Conn. App. 807. Thus, "[t]he fact still remains . . . that this father by his own choice of priorities has not taken advantage of any of the services that would demonstrate a genuine sustained effort by him to become a competent parent." (Internal quotation marks omitted.) In reDeana E., 61 Conn. App. 197, 204 (2000), cert. denied, 255 Conn. 941,___ A.2d ___ (2001). William Sr.'s denial that he needs substance abuse treatment, along with his failure to cooperate with proffered assessment and rehabilitation services, and his failure to attend to his problems with anger, homelessness and domestic violence, clearly and convincingly establish that this respondent is unwilling or unable to respond to rehabilitation efforts in a positive maimer. (Testimony of Gillian V.)
As stated in Part III. B. 1., the application of § 17a-112 requires the court to analyze whether William Sr. has achieved a degree of rehabilitation which allows it to be foreseen that, within a reasonable time in the future, he will be able to serve as a responsible, effective caretaker for William. In re Ashley S., supra, 61 Conn. App. 665; In reSarah Ann K., supra, 57 Conn. App. 448. The clear and convincing evidence in this case supports the conclusion that such rehabilitation is not foreseeable within a reasonable time. See In re Amy H., supra,56 Conn. App. 60. Any objective review of William Sr.'s child caring and parenting abilities necessarily implicates consideration of the fact that although the court terminated his parental rights to Anthony in 1998, this respondent continued his pattern of drug use, criminal behavior, and failure to maintain adequate housing. This perspective also requires the court to take heed of the fact that within mere days of his new son's CT Page 12211 birth, William Sr. was smoking crack cocaine and assaulting Tracy M., all in the infant's presence. Id. Such factors support the court's conclusion that in this matter, "[t]here was little or no evidence to suggest that the respondent had ever played a constructive and useful role as a parent." In re Sarah Ann. K., supra, 57 Conn. App. 451.
Furthermore, as has been noted, William Sr. was incarcerated at the time of trial: although he claimed to be entitled to release during the fall of 2001, he provided no documentary basis to corroborate this status. It is abundantly clear that this respondent has been incarcerated for at least four of the past eleven years, and for the greater part of his son's young life. William Sr. has no reliable plans for employment after completing his sentence: although he claims the intention to open an auto detailing business, he has been talking about this venture for many, many years, and has often claimed to be "working" when he actually has no lawful employment, yielding the result that little weight can be attributed to his plans for this entrepreneurial pursuit.[26] (Exhibit 21; Testimony of William Sr.) Lamentably, William Sr. also has no specific plans for a suitable stable residence in which he could provide a home for his son. The respondent has indicated that upon discharge from the DOC, he intends to live with his teenaged daughter, who has no permanent home of her own. (Exhibit 21.) Alternatively, he has explained that he would move in with his own mother, at a home he has previously identified as his own, but where the evidence reflects that he has never been a resident. (Testimony of William Sr., Kerry W.)
Thus, in its totality, the clear and convincing evidence compels the conclusion that William Sr. remains without the qualities necessary to successfully parent William, and that he lacks the ability to assume a responsible position in this child's life within a reasonable time. As found in Part III. A., William, who is just over one year old, has been adjudicated a neglected child. The court previously terminated William Sr.'s rights to his child Anthony R. The court now finds, by clear and convincing evidence, that whether measured as of the date of the TPR filing or as of the completion of this trial, this respondent has not achieved such a degree of personal rehabilitation as would encourage the belief that, within a reasonably foreseeable time, considering William's age and needs, he could assume a responsible position in this child's life. In re Sarah Ann K., supra, 57 Conn. App. 449. Accordingly, the court finds, by clear and convincing evidence, that the petitioner has proved William Sr.'s failure to achieve rehabilitation pursuant to §17a-112 (c)(3)(E).
 IV. DISPOSITION
As to the dispositional phase of this hearing,[27] the court has CT Page 12212 considered the evidence and testimony related to circumstances and events up to and including the receipt of Exhibit A.[28]
IV. A. SEVEN STATUTORY FINDINGS
In deciding the issues related to termination, the court has considered the evidence relevant to each of the following seven findings, which are based on the clear and convincing evidence presented at trial. The court has considered the evidence and information relevant to each of these findings in the course of determining whether to terminate parental rights under this section.[29] See In re Jonathan G., 63 Conn. App. 516,528, ___ A.2d ___ (2001).
 IV. A. 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112(d)(1)
As indicated in Parts I. A. and B. and III. B. 1. and 2., and as set forth in Exhibits 21 and 24, DCF has made timely and appropriate efforts to facilitate the respondents' reunification with their child. Services following William's birth included intensive home visits by DCF and visiting nurse assistance during the first days of the child's life; offers of substance abuse evaluations to the parents; transportation to evaluations, services, visitation and court proceedings; case management services; coordinated substance abuse treatment for Tracy M. at EC-WAC, MF-WAC and MF-TS; and Tracy M.'s referrals for additional substance abuse treatment at Liberation House, Stonington Institute, Thomas Murphy Center, Carnes Weeks Center, St. Raphael's Hospital, and Merritt Hall at Connecticut Valley Hospital. (Exhibits 21, 24; Testimony of Kerry W., Gillian V.)
Although William Sr. did not comply with DCF's recommendations, he was referred to Advanced Behavioral Health for purposes of identifying an appropriate substance abuse treatment provider. Moreover, DCF provided William Sr. with a means to facilitate visitation with baby William, but the respondent determined that visits should not take place while he was incarcerated. (Exhibit 24; Testimony of Gillian V.) As noted in Part III. B. 2., DCF could provide no further services for William Sr. in view of his failure to provide caseworkers with correct, current addresses, and thus could not be contacted. (Testimony of Gillian V.)
 IV. A. 2. EFFORTS AT REUNIFICATION PURSUANT TO FEDERAL LAW — §17a-112 (d)(2)
DCF made reasonable efforts to reunite Tracy M. and William Sr. with their child pursuant to applicable federal law, given the situation and circumstances here existing, and recognizing the respondents' protracted CT Page 12213 problems with the criminal justice system and in achieving rehabilitation. See Part III. A. The institution of termination proceedings is consistent with the federal law which seeks to limit foster care drift and to secure permanent placement for children who are in foster care.
 IV. A. 3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (d)(3)
Tracy M. failed to adequately comply with the specific steps which obliged her to avoid further involvement with the criminal justice system, by means of her arrest for driving under the influence and her multiple convictions in April 2001. Tracy M. further failed to comply with the steps' obligations for compliance with substance abuse rehabilitation, participation in a Women and Children's residential treatment center, and attendance at personal and parenting counseling to address her issues related to anger and domestic violence.
Although he was subject to a service agreement, no specific steps or other court orders were in effect for William Sr.
 IV. A. 4. FEELINGS AND EMOTIONAL TIES OF THE CHILD — § 17a-112(d)(4)
William is bonded with his foster family. He is too young to be able to verbally express his feelings for Tracy M., and he barely knows William Sr., who has elected not to have the child visit during his incarceration.
 IV. A. 5. AGE OF THE CHILD — § 17a-112 (d)(5)
William was born July 2000, and has just passed his first birthday.
 IV. A. 6. EFFORTS MADE TO ADJUST PARENTS' CIRCUMSTANCES — §17a-112 (d)(6)
Both parents have failed to make realistic and sustained efforts to conform their conduct to acceptable parental standards. Both Tracy M. and William Sr. continued to use illegal drugs while the service agreement was in effect. While Tracy M. briefly attended various programs that were offered for her personal rehabilitation, her persistent lack of cooperation led to her discharge from all services. William Sr.'s failure to participate in substance abuse assessment effectively precluded his rehabilitation. Both parents have been incarcerated for a substantial part of William's life, again indicating their failure to adopt acceptable standards of parental behavior. CT Page 12214
 IV. A. 7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAINING A RELATIONSHIP WITH THE CHILD — § 17a-112 (d)(7)
Although the limitations inherent in the foster care and criminal justice systems have been in effect in this case, neither parent has been prevented from maintaining a meaningful relationship with William by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or agency, or by the economic circumstances of the parent.
IV. B. BEST INTERESTS OF THE CHILD — § 17a-112 (c)(2)
The court is next called upon to determine whether termination of the parental rights of Tracy M. and William Sr. would be in William's best interests.[30] Applying the appropriate legal standards[31] to the facts which are clearly and convincingly apparent in this case, the court finds that termination of the respondents' parental interests will best serve the child at issue here.
The clear and convincing evidence in this matter establishes that it is not in William's best interests to continue to maintain any legal relationship with his biological parents, or to allow additional time for such a relationship to develop. At one year of age, William remains completely dependent upon his caretakers. As indicated by his GAL, William both requires and is entitled to a nurturing, stable environment, with consistent and committed parent figures who can maximize his opportunities for a safe, healthy, happy and comfortable childhood: as indicated in Parts III. B. 1. and 2., neither respondent is able to fulfill this role. (Testimony of Kerry W.) The able foster parents who are now caring for William would like to adopt him, and other families have expressed similar interest. (Testimony of Gillian V., Kerry W.) Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. In re JuvenileAppeal (84-CD), 189 Conn. 276 (1983). With regard to the need for efficiency in addressing the permanency issues presented by this case, the Appellate Court has also sagely noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992).
It is clear that Tracy M. and William Sr. love their young son. Nonetheless, this emotion, however powerful, is unable to overcome the clear and convincing evidence that both respondents are unable or unwilling to provide the permanent and secure environment in which this child should be raised. Despite their professed love for William, Tracy M. and William Sr. have not conducted themselves in a way which CT Page 12215 actualizes that love into a maimer of life conducive to appropriately caring for William. During the year that has passed since DCF became involved with this child, neither parent effectively initiated the significant personal changes necessary to be able to serve as a responsible caretaker. "[A] parent's love and biological connection . . . is simply not enough" when the circumstances indicate, as here, that the respondents cannot serve as competent parents because they have not become rehabilitated, and remain subject to their entrenched pattern of drug use, and criminal activities. In view of this evidence, it would be disingenuous for the court to conclude other than that neither Tracy M. nor William Sr. can now, or will in the near future be able to, provide their child with the nurturing, safe and predictable environment William so richly deserves. In re Ashley S., supra, 61 Conn. App. 667.
The clear and convincing evidence in this case supports the recommendation of William's GAL, who sincerely submits that termination of the respondents' parental rights will be in the best interest of this child. Absolutely no evidence to establish the unreasonableness of this request was received by the court. The court concurs, and finds that the parental rights of Tracy M. and William Sr. must give way, in order to allow William to be free to pursue a safe, secure and happy life of his own.
Accordingly, with respect to the best interests of the child contemplated by § 17a-112 (c)(2), the court finds by clear and convincing evidence, and based upon all of the foregoing, including the testimony and evidence presented, that termination of the parental rights of Tracy M. and William Sr. will serve William's best interests.
 V. MOTION FOR TRANSFER OF GUARDIANSHIP
As noted in Part IV., William requires stability and consistency in his environment. The transfer of guardianship promoted by Tracy M. would leave this child's situation impermanent and unresolved, as it would allow others to come forward in the future to request revocation of commitment or an additional change of guardian.
Tracy M. has proposed that guardianship be transferred to her younger sister, Jennifer M., who was born December 21, 1978. Jennifer M. has recently relocated from Connecticut to Florida to the state of Maine, where she plans to remain. (Testimony of Kristen M.) She did not attend any court proceedings related to the transfer of guardianship, and did not testify at trial.
Clear and convincing evidence establishes that Jennifer M. has incurred unemployment and financial challenges which limited her ability to serve CT Page 12216 as the sole support for her own two minor children. (Testimony of Kristen M.; Gillian V.) She has repeatedly formed relations with individuals who physically abuse her, stalk and control her, threaten and harass her and her daughter, Amber M.; who possess firearms and abuse drugs; and who violate the protective orders to which they are subject. (Exhibits 14, 15, 17, 18, 19, 20; Testimony of Kristen M.) Jennifer M. has chosen to use individuals who are prone to anger and violence as caretakers for her own children. (Testimony of Kristen M.; Gillian V.) The evidence overwhelmingly reflects that Jennifer M. lives in an environment marked by domestic chaos, requiring repeated police intervention, and causing her to suffer severe emotional distress. (Exhibit 16; Testimony of Gillian V.) Moreover, Jennifer M. does not intend to provide a permanent home placement for William, but intends to return the child to Tracy M.'s care when she completes serving her sentence. (Testimony of Kerry W.)
As noted by William's counsel, Jennifer M.'s failure to attend the hearing of the motion to transfer guardianship further supports the inference that she has other priorities which she chooses to address, and that she is neither appropriately interested in, nor capable of, caring for William in an appropriate manner.[32] The court concludes, by a preponderance of the evidence, that it is not in this child's best interests to be placed in the day-to-day care of his maternal aunt, with whom he does not have a bond, who presents as an individual who maintains an unstable and disordered lifestyle, and who is consistently exposed to threats, harassment and violence. For all of the foregoing reasons, the court denies the respondent mother's motion for transfer of guardianship.
 VI. ORDER OF TERMINATION
The court, having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights, and having determined, upon all of the facts and circumstances presented, that it is in the best interests of William to terminate the parental rights of Tracy M. and William R., Sr., accordingly ORDERS:
That the parental rights of Tracy M. and William R., Sr. are hereby terminated as to the child, William R.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for William R., for the purpose of securing an adoptive family or other permanent placement for this child. Preference for permanent placement is to be given to William R.'s current foster parents. CT Page 12217
That within thirty days of this judgment a written report addressing a permanency plan for the child shall be submitted by the Commissioner, and that such further reports shall be filed by DCF as are required by state and federal law.
BY THE COURT,
N. Rubinow, J.